We'll hear argument next in Molina v. City of Rochester, 18632. Good morning. May it please the court. My name is John Regan. I represent Mr. Molina, the appellant plaintiff in this matter, and I was also the attorney in the court below. A couple of preliminary things I did want to point out. There were a couple of miscites in my brief. One was to the Jacques V. Cleanup Group case, which was at 96 Fed Third, not 93 Fed Third. And then I did quote from a CFR, 29 CFR 1630.2, which I think has been changed in the years since. Some of the wording has been changed, but not the substance of what I quoted. So I apologize for any inconvenience. Why don't you get to the merits. To one other preliminary thing, last week, this panel of this court consisting of Jacobs, Judge Jacobs, Hall, and Droney came down with a case called Fox v. Costco Wholesale. This pertains to the last issue I raised in my brief, where it appears that they assume more than hold, but still nevertheless assume that a disparate treatment claim or perhaps other kinds of claims under the ADA are subject to the McDonnell-Douglas burden shifting. The way to do that in the ordinary course is to submit a letter pursuant to Rule 28J. I'm sorry, Your Honor. Yes, I'll get directly to the merits then. One of the things that strikes me about this case is that it seems to me that without the city digging its heels in, we could have resolved all this with about a 10-minute meeting. And yet here we are with six years of litigation, and now we're up on appeal. I don't believe there are any serious issues of fact regarding whether or not the plaintiff is disabled, or at the very least there are serious issues of fact about whether he's disabled. There were two letters. This is on summary judgment, correct? Correct. There were two letters. You say that you don't believe that there are any serious issues of fact. Well, there are no serious issues of fact. It really should have gone in our favor. I mean, we have two letters from we have a man that works at what everyone agreed is very heavy manual labor. And I do think one of the difficulties here is that we, as a group, we don't have that much experience with heavy manual labor. But the fact is that heavy manual. Well, don't make assumptions. Well, I don't. I myself have had a little. But heavy manual labor can be very debilitating over time. And what the record indicates is that you have- What do you have to say to Dr. Pertree's letter of May the 10th, 2017, in which he stated his opinion that Mr. Molina was not disabled? Well, what he stated in that letter, Your Honor, was that before saying that, that he stood by his previous two letters. But that in his opinion, Mr. Molina was not disabled. But disabled is a term of art within the ADA. And I have no way of knowing whether Dr. Pertree was familiar with that term of art when he made that, when he wrote that letter. What I do know is that I've been attempting to contact Dr. Pertree so that we could get a deposition from him. But- We have a record here, right? Yes, Your Honor. And your efforts to contact him don't have much to do with this record. Could we stick to the record? Well, I think what the record indicates and what the letter says is that Dr. Pertree said that in his opinion that Mr. Molina was not disabled. But he also stood by his previous two letters, which were dated- don't appear in the letter, with all due respect. And in the previous two letters, in the penultimate one, he said there are no specific restrictions. But he'll continue to have, quote, issues, close quote, with his shoulders. And essentially asks for a new job for him. And in the March 2011 letter, he recommends that the man be transferred to a different department and says he will likely have some ongoing restrictions with his shoulders and talks about weight issues. Now, the only place he talks about disability is in the letter where he said he doesn't have any. Your Honor, I- What he wrote was two recommendations that his patient be given a new job that the patient apparently wanted to get. Which gives you a big problem because, as I see it, basically if those letters raise an issue of fact as to anything, they raise an issue of fact as to whether he could do the essential functions of his job with or without a reasonable accommodation. Well, Your Honor, I- First of all, the disability claim in Dr. Paratree's letter of 2017, it's not- it doesn't- There are all kinds of disability. The doctor, there's no evidence in the record that indicates the doctor has any expertise on whether, you know, on the difference between disabled under the workers' compensation law- Does any of the doctor's letters say, either in those specific words or in other words, that this person is disabled or what qualifies as disabled? He says he recommends, my recommendation is to be given a lighter duty job. Your Honor, there's no dispute that this is a man who had bilateral rotator cuff surgeries to both shoulders where he injured himself in 2008. He- on his left shoulder. He was out for more than a year. He had surgery. He came back. He- within two months, he injured his- You have the burden of establishing disability. And to the extent you rely on the doctor's letters, where- No. Well, I'm not relying on the doctor's letter. This is a textbook case of disability. It's right out of the regulations, right out of the- The regulations say, and words are in substance, that a person who has had bilateral rotator cuff surgery is thereafter disabled as a matter of law for life. Well, what the regulations say is that if- well, first of all, you have the amendments in 2008 to the ADA were specifically directed at the Toyota case. And the Toyota case had specifically a woman who injured herself on the job and couldn't do- lift things over her head anymore. Now, if you looked at the deposition transcripts here, one of the main claims of the plaintiff is that he can't do the recycling routes without excessive pain because he has to- he had two rotator cuff surgeries. He can't lift the boxes over his head, which was not required for the trash routes. So if you look at particularly the depositions of Mr. Belknap and the plaintiff's affidavit, it's- Was lifting boxes over his head on the recycling route part of that job? If you did recycling route, but there are other kinds of routes, not to mention, Your Honor. I understand. And maybe he could have been president of the city council, too, and that would have been less strenuous. Your Honor, I don't think- Please answer my question. It was part of the job to work the recycling route, and it was part of the recycling route, you're telling me, that he had to lift heavy boxes over his head. Is that right? It was not necessarily part of the job to work a recycling route. They had different kinds of routes. He functioned as a spare, and they could have assigned him- since they have 20 spares on any given day, they could have assigned him in such a way as to not have to do a recycling route, or at least not the heaviest recycling route. Not to mention- Did he identify a specific job that was vacant that would have allowed him to, with a reasonable accommodation, perform the essential function of that job? Well, Your Honor, that's- Just answer that question, please. Did he do that? I don't think that's a fair question, Your Honor. So there are very few rules here, actually, ironically, but one of those is a question posed by someone on this side of the bench becomes relevant and fair. All right. So did he do that? Did he identify a specific accommodation that he requested? No. I would say the fair answer to that question would be no. Forget and slide by the issue of whether or not he's disabled. If that's your answer, how do you possibly prevail under McBride? Well, I think that's one of the problems with McBride is that- So we would have to revisit McBride is what you're saying? Well- Is that right? I don't- You would have to change the analysis in McBride. Is that correct? Well, I did say, I did argue in the brief that I think McBride is very problematic on a number of fronts, and that's one of them, that the purpose- I can see how that might be problematic to you. Well, maybe there's- The problem is that it's completely contrary to the ADA. I mean, this is a statute. I don't get the- You know, I don't pass the law. It's the Congress that passes the law. They're the ones that say that you have an interactive process that is supposed to- The very purpose of it is to identify specific accommodations and identify specific disabilities. So one of the problems with McBride here is that- is reflected in the questions I'm getting from the court, which is if we don't have an interactive process, we can identify a specific accommodation because that's information that's in the hands of the city. You reserved three minutes for rebuttal? Yes, I did. So we'll hear from the other side, and then we'll hear back from you. Good morning, Your Honors. John Campolito for the City of Rochester. Your Honors, there's three points that I wanted to make that I think need to be reiterated in my argument and supplement my brief. The first point, and I think a serious point, is the standard which the lower court used to review this case. I think this court and some of the other circuits are drifting towards an analysis of a mixed motive when we're looking at ADA cases instead of what we've previously- Drifting. I'm sorry? We're drifting. Okay. Interesting word. And what I wanted to say in this argument is that I don't think it matters in this case. We're looking at a case where there was not one submission of evidence which shows a discriminatory intent on the City of Rochester. The discipline issue started from the beginning, and that was noted in the lower courts. He had a very poor disciplinary record, right? That's correct, Your Honor. Talk a little bit about that? Well, as the lower court indicated, the disciplinary issue started almost immediately upon his having been hired by the City of Rochester as an EOS, which is basically a refuse worker. There's two roles to that type of job, and both equally important. That is picking up trash and picking up recycling. Since this time, since the times we're talking about, the recycling has taken on a bigger role in the City of Rochester. But at that time, it was mostly picking up trash and also some recycling. Those were criteria for the job. That was the job duty for an EOS, one, which was the job that the plaintiff had in this case. So to get back to my point, Your Honor, the disciplinary record is clear. It was all the way from the beginning to the end, some serious charges, some not so serious charges. And you can look at the record, and you can also tell that there really is no connection between any type of adverse employment action, which we have here in the termination, and the disciplinary action. And that's because the disciplinary action started at the beginning and continued to the end. I'm confused. So the commissioner sends a letter, a final letter, saying, we're terminating you. And then in that letter, it's three or four pages, he provides a lengthy list of disciplinary misconduct and failures by Mr. Molina. And you're telling us that the termination is not connected to that record? I'm puzzled. No, what I was saying is the termination is based on the disciplinary record. And I just want to correct myself. There was no connection between the adverse employment action to a disability. A disability. Yes, that's my mistake, Your Honor. It was fairly surprising. Misspoke. The second point I wanted to make is in terms of the accommodation and the discussion that we just had regarding McBride. In this case, the city was never one of the principles of a reasonable accommodation is that the city has to be shown that the person requesting a reasonable accommodation has shown an accommodation which will allow the person that needs the accommodation to do the essential functions of the job. We just never had that. Certainly, in the record, you can find a specific instance where there might have been some kind of innuendo that the plaintiff needed an accommodation. There are a couple of questions posed about whether or not Mr. Molina was disabled. And I find it interesting that you don't start with that. I take it that you end with that. In the record, it appears that the employer, your client, sort of assumed that he had some form of disability. Is that fair to say? Regardless of the letter and so on from the doctor, the course of conduct makes it appear that they assumed he had some form of disability. If there were a reasonable accommodation, they would try to accommodate him, particularly if we're talking about trash collection and you've got double rotator cuff or whatever it is, the surgery. Your Honor, that's a very good point. And I think the judge struggled with that, too. There's a good chunk of time that we're talking about here. We're talking about four to five years. And during that time, the plaintiff did receive reasonable accommodations on various occasions. He was put on a light duty assignment. What the light duty assignment is, is basically you're taken off of the trash route and you're put into one of two positions. And these are bargain for positions that are available sometimes, sometimes they're filled. But the plaintiff did take advantage of the light duty in the earlier part of his career. And to get back to your question, Your Honor, I don't know for a fact that the city administration or the directors in the refuse division considered him disabled. I think they had a history of him having problems. But I can't say that they recognized him necessarily as disabled. It's the plaintiff's burden, right? That's correct. And certainly the burden was not proven out here. We received no request for accommodation. We received very scant medical information. And the medical information we did receive did not say he was disabled. It said he was able to do the job without restriction. And I think if you're looking at that, that's what the city had to go by. But the course of conduct of the city is inconsistent slightly, based on what you just said, with this representation that he's able to do the job. Well, there were certain points, Your Honor. That's the point that I find a little puzzling and makes me a little wary of wading into whether or not someone like him was disabled. And Your Honor, that's a good point. And I think the lower court struggled with that, too. But I think in the end, what the lower court found was that there were two major things lacking. One was that there was no submission by the plaintiff or no rebuttal by the plaintiff that the city in any way discriminated against him or any of the adverse employment. Sure, sure. But that gets past this issue of whether or not he's disabled. Your Honor, I would say clearly he had issues because he took worker's company. He was gone from the city of Rochester for periods of a year two different times. So there's no doubting that at certain points he was not able to work. But in terms of considering him disabled at the time of his termination or disabled at all, no, I don't think that the city considered him disabled. Okay. I will reserve the rest of my time unless there's any other questions, Your Honor. Thank you very much. We'll hear from Mr. Regan. I just think on this question of whether he was capable of doing the job, there's no issue but that he did the job steadily from 2012 until 2013 until he was terminated. He wasn't terminated for not doing the job. Also, the court may not have noticed that the district court found that the plaintiff was disabled for a period of time. He bifurcated, the trial judge bifurcated the period before January of 2012 and after 2012 and said that it appeared that there was at least an issue of fact that he was disabled before 2012 but not afterwards. But even if that is true, I don't understand how we don't have a failure to accommodate because the letter putting them on notice and also the district court pointed this out, that the letter at least put them on notice that there was a need for an interactive process, the letter of 2011. You're confusing me. If we accept, as I thought you were proposing for the sake of discussion, that he was disabled in an early period and then not disabled later, the termination comes at the end of the later period during which he was not disabled and therefore how is there an ADA case here? Your Honor, I did not mean to suggest that I was simply addressing the point on rebuttal that there seemed to be some doubt about whether he was disabled and that we had no evidence of his disability when in fact the district court found that for a period of time he was disabled. Now, whether that disability continued into 2013, you'd still have a failure to accommodate for the period for which he was disabled and as the district court pointed out, there wasn't even a procedure at the city for making a report or a request for an accommodation so that the interactive process could be instituted. You're drawing an argument. You're saying that there's a failure to accommodate argument or claim and then there's a wrongful termination claim under the ADA. Well, the court has in various cases defined different aspects of an ADA claim, one of which is a failure to accommodate, another of which is disparity of treatment, another of which is retaliation, but certainly the failure to accommodate when you have the district court finding that they didn't even have a procedure to make a request for an accommodation and then complaining that there was no request made, I don't see how for the period from at least 2008 until 2011 we don't have a refusal to accommodate claim. Thank you very much.